**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

BONDEX INSURANCE COMPANY,

Plaintiff,

vs.

TRIO SITEWORKS, LLC; PAUL VERNA and
MARIA VERNA,

Defendants,

CIVIL ACTION NO: 19-614

**AMENDED COMPLAINT**

Plaintiff, Bondex Insurance Company ("Bondex"), by way of Amended Complaint against Defendants Trio Siteworks, LLC ("Trio"), Paul Verna and Maria Verna, jointly and severally, alleges and says:

**PARTIES**

1.      Plaintiff, Bondex, is a New Jersey corporation with a principal place of business located at 30A Vreeland Road, Florham Park, New Jersey.

2.      Defendant, Trio, is, upon information and belief, a Pennsylvania Corporation with a principal place of business at 1167 West Baltimore Pike, Suite 268, Media, Pennsylvania 19063.

3.      Defendant Paul Verna is a natural person who, upon information and belief, resides at 600 Crum Creek Road, Media, Pennsylvania 19063.

4.      Defendant Maria Verna is a natural person who, upon information and belief, resides at 600 Crum Creek Road, Media, Pennsylvania 19063.

## JURISDICTION AND VENUE

5.      Jurisdiction is conferred on this Court by 28 U.S.C. § 1332 and 28 U.S.C. § 1367 because the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs, and complete diversity of citizenship exists between the Plaintiff and the Defendants.

6.      Venue lies in this district pursuant to 28 U.S.C. § 1391(a) because the Defendants reside in this judicial district.

## FIRST COUNT

### (Fraud)

7.      Bondex repeats and re-alleges paragraphs 1 through 6 hereof as if set forth herein

8.      Trio and/or its principals and/or representatives requested that Bondex issue surety bonds on behalf of Trio.

9.      As one of the conditions to the issuance of any bonds, the Defendants Trio, Paul Verna and Maria Verna (collectively, "Indemnitors" or "Defendants"), were obligated to go through Bondex's underwriting procedures so that Bondex could determine if Bondex would issue bond(s) on behalf of Trio.

10.     As part of this underwriting process, Defendants were obligated to submit financial statements and other documentation to Bondex to determine if Bondex was willing to issue bonds on behalf of Trio and, if Bondex was to issue bonds, the penal sum(s) of any such bond(s).

11.     As part of Bondex's underwriting process, on or about May 3, 2016, Paul Verna and Maria Verna submitted a "Report on Compiled Statement of Financial Condition" ("2016 Financial Condition Statement") to Bondex.

12.     The Financial Condition Statement consists of an Accountants' Report Letter and a Statement of Financial Condition.  A copy of this document is attached hereto as **Exhibit A**.

13.     The Accountants' Report Letter was prepared by Verna and Associates.

14.     According to the Statement of Financial Condition, on May 3, 2016, Paul Verna was a ninety (90) per cent owner of Verna & Associates.

15.     On May 3, 2016, Paul Verna and/or Maria Verna was/were the sole owners of Out of Site Infrastructure ("Out of Site").

16.     Upon information and belief, at that time, United States Surety Company provided bond(s) to Out of Site.

17.     Upon information and belief, Out of Site, Paul Verna and Maria Verna executed a written General Agreement of Indemnity ("GAI") in favor of United States Surety Company wherein Out of Site, Paul Verna and Maria Verna agreed, *inter alia*, to indemnify and/or exonerate United States Surety Company in connection with any losses sustained by United States Surety Company in connection with bonds issued by United States Surety Company on behalf of Out of Site.

18.     Upon information and belief, subcontractors of Out of Site and/or Obligees under Performance Bond(s) issued on behalf of Out of Site made claims against United States Surety Company's bond(s).

19.     As a result of these claims, upon information and belief, on May 13, 2016, United States Surety Company made a collateral demand against Out of Site, Paul Verna and Maria Verna.

20.     This collateral demand occurred 10 days after Paul Verna and Maria Verna submitted the 2016 Financial Statement to Bondex.

21.     The 2016 Financial Statement does not mention any liability related to the GAI executed by Paul Verna and Maria Verna with respect to the bonds issued by United States Surety Company on behalf of Out of Site.

22.     Upon information and belief, at the time that Indemnitors Paul Verna and Maria Verna transmitted the 2016 Financial Statement to Bondex, they knew that Paul Verna and/or Maria Verna would have liability to United States Surety Company.

23.     Even if Indemnitors Paul Verna and Maria Verna did not know that they had liability to United States Surety Company at the time they transmitted the 2016 Financial Statement to Bondex, they had an obligation to advise Bondex of their liability to United States Surety Company at the time they learned about their liability on May 13, 2016 from the collateral demand.

24.     On October 27, 2016, United States Surety Company entered a Two Million ($2,000,000.00) Dollar Judgment (hereinafter "Judgment") against Out of Site, Paul Verna and Maria Verna.

25.     Indemnitors never advised Bondex that the $2,000,000 Judgment was entered not only against Out of Site but also against Paul Verna and Maria Verna, individually.

26.     The Defendants Paul Verna and Maria Verna had an obligation to advise Bondex of any judgments against them as part of Bondex's underwriting process.

27.     Had Paul Verna and/or Maria Verna disclosed the Two Million Dollar ($2,000,000) Judgment, Bondex would have considered entering into contracts with Paul Verna and Maria Verna a significantly higher business risk.

28.     Had Bondex been advised about the $2,000,000 Judgment against Paul Verna and Maria Verna, same would have affected Bondex's underwriting decisions, and decision to enter

into a contract with Paul Verna and/or Maria Verna upon which Bondex issued bonds on behalf of Trio.

29.     Defendants Paul Verna's and Maria Verna's failure to advise Bondex that a Judgment was entered against them personally constitutes a material factual misrepresentation.

30.     Indemnitors were aware of the falsity of these misrepresentations when they were made to Bondex.

31.     Indemnitors made these misrepresentations to Bondex with the intention that Bondex rely on same in connection with its underwriting process and entering into a contract with them.

32.     Bondex reasonably and justifiably relied on these misrepresentations to enter into a contract with the Defendants and to issue bonds on behalf of Trio.

33.     Bondex has received claims on some of these bonds and has and will continue to sustain losses on these bonds.

## CONSTRUCTION OF THE REPUBLIC BANK FAIRLESS HILLS, PARCEL #05-46-388 Parcel B ("Fairless Hills Bond")

34.     At the specific request of the Indemnitors, and in reliance upon the GAI, Bondex issued a Subcontract Performance and Payment Bond, Bond No. BX02240 ("Fairless Hills Bond"), on behalf of Trio, as principal, with respect to the project known as Construction of the Republic Bank Fairless Hills, Parcel # 05-46-388 Parcel B, Bristol, PA 19010 ("Fairless Hills Project").

35.     Nason Construction Inc. ("Nason") was the Obligee on the Fairless Hills Project.

36.     Nason made a Performance Bond claim against Trio.

37.     Subsequently, Nason was sued by the Owner in connection with its work on the Fairless Hills Project. ("Nason litigation")

38.     Nason interposed a Third Party Complaint against Trio and Bondex in connection with Trio's work on the Fairless Hills Project.

39.     Bondex settled Nason's Performance Bond claim and the Nason litigation by making a payment of $115,000.00 to Nason.

40.     Additionally, Bondex incurred significant attorneys' fees and costs related to the Nason litigation.

### SCHWENKSVILLE BOROUGH AUTHORITY BOND ("SCHWENKSVILLE PAYMENT BOND")

41.     Bondex issued a Payment Bond on behalf of Trio in connection with a construction contract between Trio and the Schwenksville Borough Authority related to a project entitled "Contract 18-1 Main Street and Church Road Water and Sewer Main Replacement" ("Schwenksville Project").

42.     Several subcontractors have asserted claims against Bondex in connection with the Schwenksville Payment Bond wherein they alleged that they were not paid for work performed on and/or materials provided to the Schwenksville Project.

43.     As a result of these claims, Bondex has sustained and/or will sustain losses in connection with issuing the Schwenksville Payment Bond on behalf of Trio.

### LOWER MAKEFIELD TOWNSHIP, PA BID BOND ("LOWER MAKEFIELD BID BOND")

44.     Bondex also issued a Bid Bond, Bond No. BDX000024104, on behalf of Trio in connection with a construction project for Lower Makefield Township, Pennsylvania ("Lower Makefield") entitled "Heacock Force Main Replacement Project."  ("Heacock Project")

45.     Lower Makefield has made a claim against the Lower Makefield Bid Bond.

46.     In its claim, Lower Makefield alleges that Trio was the successful low bidder on the Heacock Project.

47.     Lower Makefield further alleges that as Trio was the successful bidder on the Heacock Project, Trio was required to submit all contract documents to Lower Makefield.

48.     Lower Makefield further alleges that, although Trio was obligated to provide all contact documents on the Heacock Project, Trio failed to do so.

49.     As a result of Trio's alleged failure to produce contract documents, Lower Makefield terminated Trio.

50.     As a result of this claim asserted by Lower Makefield against Bondex, Bondex has and/or will sustain losses.

51.     Additionally, it is possible that Bondex may sustain additional losses on other bonds that it issued on behalf of Trio.

52.     Due to the fraud committed by some or all of the indemnitors, Bondex is entitled to recover damages.

**WHEREFORE**, Bondex requests judgment against Defendants, jointly and severally, for:

a)     Indemnification for all losses which have been or will be incurred by Bondex as a result of issuing bonds on behalf of Trio;

b)     Treble damages;

c)     Punitive damages;

d)     All legal fees;

e)     All consultant and/or expert fees;

f)     All costs and expenses;

g)     Interest; and

7

h)      Such other relief as the Court deems appropriate.


## SECOND COUNT

### (Fraud in the Inducement)

53.     Bondex repeats and re-alleges paragraphs 1 through 52 hereof as if set forth herein.

54.     Indemnitors made representations to Bondex related to their financial status.

55.     These representations were material to Bondex deciding to issuing bonds on behalf of Trio.

56.     Indemnitors falsely made these representations with knowledge of their falsity or recklessness as to their truth.

57.     These representations were made with the intent of Bondex relying on them.

58.     These representations were specifically made to induce Bondex to issue bonds on behalf of Bondex when it had no obligation to do so.

59.     Bondex justifiably relied upon these representations in deciding to issue bonds on behalf of Trio.

60.     Due to the issuance of these bonds, Bondex sustained losses.

61.     Due to Indemnitors' fraudulent inducement, Plaintiffs are entitled to damages.

**WHEREFORE**, Bondex requests judgment against Defendants, jointly and severally, for:

a)      Indemnification for all losses which have been or will be incurred by Bondex as a result of issuing bonds on behalf of Trio;

b)      Treble damages;

c)      Punitive damages;

d)      All legal fees;

e)      All consultant and/or expert fees;

f)      All costs and expenses;

g)      Interest; and

h)      Such other relief as the Court deems appropriate.

## **THIRD COUNT**

### (Fraudulent misrepresentation)

62.     Bondex repeats and re-alleges paragraphs 1 through 61 hereof as if set forth herein.

63.     Indemnitors made numerous representations related to their financial conditions.

64.     Indemnitors' claims related to their financial conditions were false.

65.     Indemnitors knew that the claims related to their financial conditions were false.

66.     Bondex relied on representations as to Indemnitors' financial conditions in deciding to issue bonds on behalf of Trio.

67.     Indemnitors made these representations to Bondex with intent of influencing Bondex.

68.     Due to reliance on these representations, Bondex sustained losses.

69.     Due to the Indemnitors' material misrepresentations, Bondex is entitled to damages.

**WHEREFORE**, Bondex requests judgment against Defendants, jointly and severally, for:

a)      Indemnification for all losses which have been or will be incurred by Bondex as a result of issuing bonds on behalf of Trio;

b)      Treble damages;

c)      Punitive damages;

d)      All legal fees;

e)      All consultant and/or expert fees;

f)      All costs and expenses;

g)      Interest; and

h)      Such other relief as the Court deems appropriate.


## FOURTH COUNT

### (Specific Enforcement of General Indemnity Agreement)

70.      Bondex repeats and re-alleges paragraphs 1 through 69 hereof as if set forth herein

71.      As another condition precedent to the issuance of any bonds, Indemnitors executed, on August 2, 2017, a written General Agreement of Indemnity ("GAI") (a copy of which is annexed hereto as **Exhibit B),** the terms and conditions of which are incorporated herein by reference.

72.      Section 2 of the GAI provides, in relevant part, that:

The Indemnitors hereby, jointly and severally, covenant, promise and agree to indemnify and hold harmless Surety from and against ANY AND ALL LOSS WHATSOEVER, including but not limited to any and all liability, loss, claims, demands, costs, damages, attorneys' fees and expenses of whatever kind or nature, together with interest thereon at the rate set forth in Section 2.7 hereof, which Surety may sustain or incur for which the Surety becomes liable or has reason to believe it may be, or may become liable by reason of or in consequence of the execution and/or delivery by Surety of any Bond(s) on behalf of any Indemnitor, whether or not, such Bond(s) has been issued prior to execution hereof and whether or not Surety shall have paid any amount on account thereof, including but without limitation:
2.1      Liability incurred, amount(s) paid and/or amount(s) reserved as to satisfaction or settlement of any and/or all claims, demands, damages, costs, losses, suits, proceedings and/or judgments relating to Principal's nonperformance, incomplete performance and/or alleged nonperformance or incomplete performance of an Obligation (referred to herein as any agreement, undertaking and/or other duty, the performance of which is guaranteed by Surety pursuant to

and/or is the subject of a Bond) or any other matter covered by a Bond, or which, in the Surety's sole determination, may be covered by a Bond; plus

2.2     Liability incurred and/or expenses paid and/or incurred in connection with claims, suits or judgments relating to an Obligation or a Bond, including, without limitation, attorneys' fees and all legal expenses, expert fees, and all fees and costs for investigation, accounting and engineering services, whether on salary, retainer or otherwise; plus

2.3     Liability incurred and/or expenses paid in procuring or attempting to procure a release of liability under and/or exoneration of a Bond; plus

2.4     Liability incurred and/or expenses paid in recovering or attempting to recover losses or expenses paid or incurred in connection with this Agreement, an Obligation and/or a Bond; plus

2.5     Liability incurred or demands, claims, damages or expenses resulting from the failure of a Principal or Indemnitor to perform or comply with any or all the covenants and conditions of this Agreement, including, without limitation, the costs and/or expenses of Surety in connection with the enforcement of any of Principal's or Indemnitor's covenants and conditions contained herein or in connection with the exercise of any remedy of Surety hereunder, including, but not limited to Surety's attorneys' fees, all legal expenses, expert fees, consultant fees and all of Surety's costs whether for employees on salary or otherwise; plus

2.6     The obligations of Principal and Indemnitor hereunder shall also include, at Surety's election, exercisable by Surety by the delivery of written notice to any Principal and/or Indemnitor, the obligation to defend at Principal's and/or Indemnitor's sole cost and expense, and with counsel acceptable to Surety, any suit, action or other proceeding initiated with respect to an Obligation or a Bond. However, Indemnitors agree that Surety has the sole discretion to decide to retain its attorneys and/or consultants and Indemnitors will be liable to Surety for all such fees and expenses.

73.     The GAI also provides for the indemnitors to exonerate Bondex and/or to provide collateral upon demand by Bondex.

74.     At the specific request of one or more of the Indemnitors, and in reliance upon the GAI, Bondex issued performance, payment and/or bid bonds on behalf of Trio.

75.     Bondex has received claims on some of these bonds and has and will continue to sustain losses on these bonds.

76.     The Indemnitors, jointly and severally, are required by the GAI to make payment to Bondex for all losses, costs, and/or expenses which have been or will be incurred by Bondex, in

satisfying bond claims in connection with bonds issued by Bondex on behalf of Trio, together with all fees, costs and expenses incurred, including those in connection with this suit.

77.     Bondex is entitled to specific performance of the GAI.

**WHEREFORE**, Bondex requests judgment against Defendants, joint and severally, for:

a)      Specific performance of the GAI, including the requirement that any losses which have been or will be sustained by Bondex be paid back immediately;

b)      All legal fees;

c)      All consultant and/or expert fees;

d)      All costs and expenses;

e)      Interest; and

f)      Such other relief as the Court deems appropriate.

## FIFTH COUNT
(Contractual Indemnification)

78.     Bondex repeats and re-alleges paragraphs 1 through 77 hereof, as if set forth herein in their entirety.

79.     The Indemnitors, by their execution of the GAI, agreed to indemnify and hold Bondex harmless for all losses, expenses, and costs, including attorneys' fees, incurred by Bondex in connection with the Bonds issued on behalf of Trio.

80.     Additionally, pursuant to the GAI, Bondex is entitled to be reimbursed for any and all costs and expenses that might be incurred in enforcing the covenants and conditions of the GAI itself.

81.     The Indemnitors are liable to Bondex for all losses, costs, and/or expenses which have been or will be incurred by Bondex in connection with the issuance of the Fairless Hills Bonds,

Schweknsville Bond, the Lower Makefield Bond and/or any other losses, fees, costs and expenses which have been or will be incurred by Bondex in connection with bonds issued by Bondex on behalf of Trio, for which indemnification is not being sought in any other action, including those incurred in connection with this suit, all in accordance with the GAI.

**WHEREFORE**, Bondex requests judgment against Defendants, jointly and severally, for:

a)      Indemnification for all losses which have been or will be incurred by Bondex as a result of issuing bonds on behalf of Trio;

b)      All legal fees;

c)      All consultant and/or expert fees;

d)      All costs and expenses;

e)      Interest; and

f)      Such other relief as the Court deems appropriate.

## <u>SIXTH COUNT</u>

(Contractual Exoneration)

82.      Bondex repeats and re-alleges paragraphs 1 through 81 hereof as if set forth herein in their entirety.

83.      The Indemnitors, by their execution of the GAI, also agreed to exonerate and hold Bondex harmless for all losses, expenses and costs, including attorneys' fees, incurred by Bondex in connection with the Bonds issued on behalf of Trio.

84.      Indemnitors are liable to exonerate Bondex as to all losses, costs, and/or expenses which have been asserted against and/or incurred by and/or will be asserted against and/or incurred by Bondex in investigating and/or satisfying the bond claims, together with all fees, costs, and expenses incurred, including legal fees, all in accordance with the GAI.

**WHEREFORE,** Bondex requests exoneration from Defendants, jointly and severally, in an amount equal to:

a)      The amounts asserted and/or to be asserted against Bondex by any and all claimants under any bond issued by Bondex on behalf of Trio ;

b)      All legal fees;

c)      All consultant and/or expert fees;

d)      All costs and expenses;

e)      Interest; and

f)      Such other relief as the Court deems appropriate.

## SEVENTH COUNT

### (Common Law Exoneration and Indemnification)

85.      Bondex repeats and re-alleges paragraphs 1 through 84 hereof as if set forth herein in their entirety.

86.      Defendant Trio was the principal on behalf of whom bonds were issued by Bondex.

87.      Since the Surety is entitled to be indemnified and exonerated by its principal at common law, Trio is liable to Bondex for complete exoneration and/or complete indemnification at common law.

88.      Bondex is entitled at common law to complete exoneration and/or complete indemnification from Trio in connection with any payments which have been, or will be made, by Bondex in connection with bonds that Bondex issued on behalf of Trio.

**WHEREFORE**, Bondex requests judgment against Trio for:

a)      The amount(s), if any, to be paid by Bondex and/or the amounts incurred and/or to be incurred as a result of Bondex having issued any bond(s) on behalf of Trio;

14

b)  All legal fees;

c)  All consultant and/or expert fees;

d)  All costs and expenses;

e)  Interest; and

f)  Such other relief as the Court deems appropriate.


**DREIFUSS BONACCI & PARKER, PC**
*Attorneys for Plaintiff Bondex Insurance Company*


By: ____/s/ Paul Mandal_____
        PAUL H. MANDAL


Dated: June 1, 2020

# EXHIBIT A

PAUL AND MARIA VERNA

REPORT ON COMPILED STATEMENT OF FINANCIAL CONDITION

MAY 3, 2016

# PAUL AND MARIA VERNA

## INDEX

|  | Page |
|---|---|
| Accountants' Report Letter……………………………………………… | 1 |
| Financial Statement: | |
|     Statement of Financial Condition………………………….…………… | 2 |



Robert J. Verna
Founder

Paul Verna, CPA
Associate

VERNA
&
ASSOCIATES

Timothy J. Battista
Member

Kerry Andrew Revelas, CPA
Associate

Joseph L. Whitaker, CPA
Associate

**PAUL & MARIA VERNA**
Wallingford, PA

We have compiled the accompanying Statement of Financial Condition of PAUL & MARIA VERNA as of May 3, 2016 in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants.

A compilation is limited to presenting in the form of financial statements information that is the representation of the individuals whose financial statements are presented. We have not audited or reviewed the accompanying financial statements and, accordingly, do not express an opinion or any other form of assurance on them.

PAUL & MARIA VERNA have elected to omit substantially all of the disclosures required by generally accepted accounting principles. If the omitted disclosures were included in the financial statement, they might influence the user's conclusions about the financial condition of PAUL & MARIA VERNA. Accordingly, this financial statement is not designed for those who are not informed about such matters.

*Verna & Associates*

Thorofare, NJ
May 3, 2016



**PAUL AND MARIA VERNA**
**STATEMENT OF FINANCIAL CONDITION**
**MAY 3, 2016**

**ASSETS**

| | | |
|---|---|---:|
| Cash | $ | 350,000 |
| Investment Accounts | | 209,000 |
| Retirement Accounts | | 228,000 |
| Cash Value - Life Insurance | | 77,000 |
| Residence - Wallingford, PA | | 1,000,000 |
| Vacation Home - Margate, NJ | | 1,100,000 |
| Notes Receivable | | 1,950,000 |
| Investment Properties: | | |
|     Haddon Heights, NJ | | 325,000 |
|     Springfield, PA | | 400,000 |
|     Springfield, PA | | 350,000 |
|     Bellmawr, NJ | | 600,000 |
| Artwork | | 75,000 |
| Automobiles | | 73,000 |
| Personal Effects | | 150,000 |
| Principle Interest: | | |
|     Out of Site Infrastructure (100% Ownership) | | 500,000 |
|     RV Professional Building, Inc. (100% Ownership) | | 435,000 |
|     Verna & Associates (90% Ownership) | | 4,500,000 |
| | $ | 12,322,000 |

**LIABILITIES**

| | | |
|---|---|---:|
| Mortgage - Wallingford, PA | $ | 538,000 |
| Mortgage - Springfield, PA | | 229,000 |
| Mortgage - Haddon Heights, NJ | | 243,000 |
| Mortgage - Margate, NJ | | 585,000 |
| Mortgage - Springfield, PA | | 157,000 |
| Mortgage - Bellmawr, NJ | | 335,000 |

**ESTIMATED INCOME TAXES, on the difference**
    between the estimated current values
    of assets and the estimated current
    amounts of liabilities and their tax bases      1,419,600

| | | |
|---|---|---:|
| **NET WORTH** | | 8,815,400 |
| | $ | 12,322,000 |

See accompanying accountant's compilation report.

2

# EXHIBIT B

Trio Siteworks, LLC.

## GENERAL AGREEMENT OF INDEMNITY

We the undersigned, individually, jointly with others, and/or on behalf of any of our successors, assigns, heirs, executors, administrators, parents, affiliates, partnerships, joint ventures, co-ventures and limited liability companies, whether in existence now or formed hereafter, (individually and collectively referred to as "Indemnitors") enter into this General Agreement of Indemnity ("Agreement") with Bondex Insurance Company and any and all of its successors, assigns, partners, fronting partners, reinsurers, subsidiaries and affiliated companies, including but not limited to Boston Indemnity Company, Inc., whether in existence now or formed hereafter (individually and collectively referred to as "Surety").

WHEREAS, in the transaction of business, certain bonds, guarantees, undertakings and/or contractual obligations, including renewals and/or extensions thereof (hereinafter referred to as "Bonds") including Bonds and undertakings for which the Surety has obligations as a result of an asset purchase, acquisition or like transaction, have heretofore been and/or may hereafter be requested and/or required by, for, or on behalf of any one or more of the Indemnitors. (The Indemnitor on whose behalf the Bond or undertaking has been requested or required may be referred to hereinafter as "Principal." Said Principal shall also be included in the term "Indemnitors"). In connection with the execution, delivery and/or assumption of obligations and/or of such Bonds, the Surety requires complete indemnification.

NOW, THEREFORE, as inducement to the Surety and in consideration of the Surety's execution of one or more Bonds, delivery of one or more Bonds, refraining from canceling one or more Bonds, and/or assumption of obligations by the Surety of one or more Bonds, and for other good and valuable consideration, the Indemnitors, jointly and severally, agree with the Surety as follows:

1. PREMIUMS. For each and every Bond issued by the Surety to or on behalf of any of the Indemnitors, the Indemnitors shall, at or before the time of execution, or, in the case of a Bond renewal, extension, modification or substitution, at the time of such renewal, extension, modification or substitution, or in the case of a term premium, at or before the commencement of the term and/or any renewal thereof, pay or cause to be paid to Surety or its designated or appointed Agent, all premiums or other charges of the Surety, in accordance with its rates prevailing at the time, and shall continue to pay same until the Surety has been furnished with evidence, satisfactory to the Surety, of its release or discharge from suretyship of all liability on the Bond(s) and in connection with all matters related thereto. If for any reason the price of any Contract is increased or additional work is performed under a Contract for an additional charge, the Indemnitors will pay additional premium(s) at the rates then in effect. This additional premium is attributable to the Surety's risk due to the increased amount of the Contract and does not result in any respect in an increase in the penal sum of any Bond(s), unless Surety otherwise expressly agrees in writing. Any and all premiums related to each and every Bond issued by the Surety shall be fully earned and non-refundable when due. Failure of the Surety or its designated or appointed Agent to collect any premium(s) when due shall not operate as a waiver of the Surety's right to such premium(s) or discharge the obligations of the Indemnitors hereunder to the Surety. Failure of the Indemnitors to pay the premium(s) when due shall be deemed a Loss and a Default for purposes of this Agreement.

2. INDEMNIFICATION. The Indemnitors hereby, jointly and severally, covenant, promise and agree to indemnify and hold harmless Surety from and against ANY AND ALL LOSS WHATSOEVER, including but not limited to any and all liability, loss, claims, demands, costs, damages, attorneys' fees and expenses of whatever kind or nature, together with interest thereon at the rate set forth in Section 2.7 hereof, which Surety may sustain or incur or for which the Surety becomes liable or has reason to believe it may be, or may become liable by reason of or in consequence of the execution and/or delivery by Surety of any Bond(s) on behalf of any Indemnitor, whether or not such Bond(s) has been issued prior to execution hereof and whether or not Surety shall have paid any amount on account thereof, including, without limitation, the following:

   2.1    Liability incurred, amount(s) paid and/or amount(s) reserved as to satisfaction or settlement of any and/or all claims, demands, damages, costs, losses, suits, proceedings and/or judgments relating to Principal's nonperformance, incomplete performance and/or alleged nonperformance or incomplete performance of an Obligation (referred to herein as any agreement, undertaking and/or or other duty, the performance of which is guaranteed by Surety pursuant to and/or is the subject of a Bond) or any other matter covered by a Bond, or which, in the Surety's sole determination, may be covered by a Bond, plus

   2.2    Liability incurred and/or expenses paid and/or incurred in connection with claims, suits or judgments relating to an Obligation or a Bond, including, without limitation, attorneys' fees and all legal expenses, expert fees, and all fees and costs for investigation, accounting and engineering services, whether on salary, retainer or otherwise; plus

   2.3    Liability incurred and/or expenses paid in procuring or attempting to procure a release of liability under and/or exoneration of a Bond; plus

   2.4    Liability incurred and/or expenses paid in recovering or attempting to recover losses or expenses paid or incurred in connection with this Agreement, an Obligation and/or a Bond, plus

   2.5    Liability incurred or demands, claims, damages or expenses resulting from the failure of a Principal or Indemnitor to perform or comply with any or all of the covenants and conditions of this Agreement, including, without limitation, the costs and/or expenses of Surety in connection with the enforcement of any of Principal's or Indemnitor's covenants and conditions contained herein or in connection with the exercise of any remedy of Surety hereunder, including but not limited to Surety's attorneys' fees, all legal expenses, expert fees, consultant fees and all of Surety's costs whether for employees on salary or otherwise, plus

   2.6    The obligations of Principal and Indemnitor hereunder shall also include, at Surety's election, exercisable by Surety by the delivery of written notice to any Principal and/or Indemnitor, the obligation to defend at Principal's and/or Indemnitor's sole cost and expense, and with counsel acceptable to Surety, any suit, action or other proceeding initiated with respect to an Obligation or a Bond. However, Indemnitors agree that Surety has the sole discretion to decide to retain its own attorneys and/or consultants and Indemnitors will be liable to Surety for all such fees and expense.

   2.7    The rate of interest shall be the maximum rate permitted by law.

3. EXERCISE OF RIGHTS BY SURETY. In connection with the exercise of any of Surety's rights under this Agreement:

   3.1    Surety shall have the right in its sole and absolute discretion to determine whether any claims under a Bond and/or in connection with a bonded project shall be paid, compromised, defended, prosecuted or appealed. Surety's decision shall

1

Initials *[handwritten initials]*

be final and binding upon the Indemnitors, and

3.2      Surety shall have the right to incur such expenses in handling a claim as it shall deem necessary, including but not limited to, expenses for investigative, accounting, engineering and legal services, and

3.3      Surety shall have the foregoing rights and the right to be fully indemnified therefore, irrespective of the fact that any Principal and/or Indemnitor may have assumed, or offered to assume, the defense of Surety upon any such claim, and

3.4      As to any claim or suit hereunder, an itemized statement of claims or losses paid or liabilities incurred and/or expenses paid or incurred, declared to be true and correct by an employee or agent of Surety, or the vouchers or other evidence of disbursement by Surety, shall be prima facie evidence of the fact and extent of liability hereunder of Principal and Indemnitors, and

3.5      Surety shall have the right to reimbursement of its expenses and attorneys' fees, whether provided by in-house or outside counsel, incurred hereunder, irrespective of whether any Bond loss payment has been made by Surety. In any suit on this Agreement, Surety may recover its further expenses and reasonable attorneys' fees incurred in such suit, and

3.6      Surety shall have at all times the right but not the obligation to retain counsel of its choice to defend itself from any claim, lien, levy, liability, suit or judgment on any Bond or against any collateral security, contract funds, trust funds or liens held by Surety or an Obligee on any bonded project, including retainages, or to prosecute an action to preserve the Surety's rights with respect to collateral security, contract funds, trust funds or liens held by the Surety or an Obligee on any bonded project, including retainages. The cost of retaining such counsel shall be included within the Indemnitors' obligation to indemnify, exonerate and hold Surety harmless.

4. COLLATERAL DEMAND. Indemnitors agree to deposit with Surety immediately upon demand (the "Collateral Demand") funds or other collateral of such kind and amount, at such time, and for the duration that the Surety may require, whether or not the Surety shall have made any payment therefore and whether or not the collateral demand may be in addition to other collateral security previously provided, to cover any indebtedness, liability, claim asserted, suit or judgment under any Bond, or in the sole discretion of the Surety the collateral security previously provided has diminished in value, is at risk or is insufficient as collateral security on such Bond; and such sum and other money and property which shall have been or shall thereafter be pledged as collateral security on any such Bond shall be available, at the discretion of Surety, as collateral security on all Bonds coming within the scope of this Agreement and/or for any other indebtedness of Indemnitors or Principal to Surety. If Indemnitors shall fail, neglect or refuse to deposit with Surety the collateral demanded by Surety, the Indemnitors agree that their failure to provide collateral as demanded by Surety shall constitute irreparable harm to Surety for which it has no adequate remedy at law, and Surety may seek a mandatory injunction to compel the deposit of such collateral, a pretrial writ of attachment and/or any other remedy at law or in equity that Surety may have. Surety shall have the right to retain such collateral and/or to perfect a lien thereon until Surety has received evidence satisfactory to Surety of Surety's complete discharge and exoneration from any claim or potential claim under all Bonds and until Surety has been fully reimbursed for any and all liability incurred and/or for claims, demands, damages, costs, loss, expense and attorneys' fees.

5. FUNDS IN TRUST FOR SURETY. Indemnitors and their respective successors, assigns, executors and administrators represent and agree that, in connection with the performance of a contract or agreement, the entire contract price or consideration to be received by the Principal shall be dedicated to the satisfaction of the conditions of the contract in question. All funds paid, due or to become due, under any contract with which the Surety shall have issued a Bond, shall be impressed with a trust in favor of laborers, materialmen, suppliers, subcontractors and Surety. Indemnitors shall use such money and other proceeds for the purposes of performing the Bonded Obligations and for discharging the obligations under the Bond and under this Agreement, and for no other purpose until the liability of the Surety under the Bond is completely exonerated. Any breach of this provision shall constitute a breach of the fiduciary obligations of Principal and/or Indemnitors as well as a misrepresentation of a material fact upon which Surety is relying when issuing any Bond(s) on behalf of any Indemnitor or Principal.

6. DEFAULT. Indemnitors shall be in default hereunder upon the occurrence of any of the following:

6.1      Any default and/or breach in the performance of an Obligation by any Principal or any declaration by any obligee of an Obligation that any Principal is in default and/or in breach (or the equivalent) thereunder;

6.2      Any breach of this Agreement by any Principal or Indemnitor;

6.3      The failure of any Principal to pay for labor, materials ordered for or used in connection with any Bonded contract, bills or other indebtedness in connection with the performance of any contract with respect to which a Bond has been executed by Surety and/or the failure of any Principal and/or Indemnitor to pay or compromise any claim that a person or entity was not paid for such labor, materials, bills or other indebtedness;

6.4      The diversion or non-use by any Principal of loan funds, equity funds or materials intended by the lender, equity contributor or supplier of such funds or materials to be used and which could be used to perform or discharge a specific Obligation in connection with the performance of any contract with respect to which a Bond has been executed by Surety;

6.5      The voluntary or involuntary cessation or suspension of work, abandonment, forfeiture, refusal or inability to perform the terms or any provision of any contract required to be performed by any Principal in connection with the performance of any contract with respect to which a Bond has been executed by Surety;

6.6      Insolvency, assignment for the benefit of creditors and/or voluntary or involuntary filing of any insolvency or bankruptcy proceedings by or against any Principal, any Indemnitor and/or any Guarantor;

6.7      If Principal, Indemnitor or any Guarantor is an individual, the death, adjudication of mental incompetence, felony conviction, imprisonment or disappearance of any Principal, any Indemnitor and/or any Guarantor;

6.8      The failure of any Principal, any Indemnitor and/or any Guarantor to promptly furnish accurate, complete and up-to-date financial statements and/or financial information upon request of Surety or the furnishing of a financial statement by any Principal, any Indemnitor and/or any Guarantor which contains any misstatement or misrepresentation;

6.9      Any material adverse change in the financial condition of any Principal, any Indemnitor and/or any Guarantor or the failure to comply with the underwriting requirements and/or contractor conditions of the Surety.

Initials ~~~

6.10    The filing of any suit or the commencement of any action or proceeding by a creditor or obligee against any Principal, any Indemnitor and/or any Guarantor in which Surety has been joined as a party or involves circumstances which are the basis of any claim made against Surety or any Bond;

6.11    Any suspension, revocation or other material adverse change in the status of any license of any Principal with any applicable licensing board or agency;

6.12    Any proceeding which deprives any Principal of the use or interferes with any Principal's use of any supplies, tools, plant, equipment, machinery or materials required for the performance of any contract with respect to which a Bond has been executed by Surety; and/or

6.13    The failure to pay any premium and/or renewal premium on any Bond

7 REMEDIES UPON DEFAULT  In the event of any default as described in Section 6 above, in addition to any other remedies Surety may have, Principals and Indemnitors hereby authorize and empower Surety to, in its sole and absolute discretion and to the extent it deems appropriate, proceed with any and/or all of the following:

7.1    To assert, pursue, prosecute, compromise or settle in whole or in part at the Indemnitors' expense any all of the rights, actions, causes of action, claims and demands assigned herein in Section 8;

7.2    To make or to guarantee advances or loans without any obligation or responsibility as to the application thereof, it being expressly understood and agreed that the amount of all such advances and/or loans shall be conclusively presumed to be a loss hereunder for which Principals and/or Indemnitors are liable irrespective of the prospects for repayment thereof or the security therefore.

7.3    To take possession of all or any part of the work to be performed pursuant to any or all Obligations and/or Bonds and, at the expense of Principals and Indemnitors, to complete the performance required by the Obligee or to cause the same to be completed or to consent to the completion thereof, and to take any other action which Surety may deem appropriate in connection therewith.

7.4    To take possession of all Principals' and/or all Indemnitors' equipment, materials, supplies, books and records at the site of the work or elsewhere, and to utilize the same for completion of any Obligation or for any purpose which Surety deems appropriate or necessary;

7.5    To have disbursed to Surety, in the name and stead of and as irrevocable attorney-in-fact of Principal and/or Indemnitors any and all construction loan proceeds allocated toward the payment of the costs of construction of any Obligation. If the subject work is being performed on real property owned or leased by Principal or any Indemnitor, then Surety shall also have the right to take possession of said real property  Surety's rights hereunder may be exercised either in person or by agent, with or without bringing any action or proceeding, or by a receiver appointed by a court;

7.6    In the event the Obligation, or any portion thereof, relates to the performance of a subdivision improvement agreement between Principal and a public entity under which one or more Bonds have been executed and/or delivered as improvement security, Surety shall receive as collateral security and be authorized to act as attorney in fact with respect to the sale, lease or transfer of any and all real property which is the subject of the subdivision improvement agreement then owned by any Principal and/or Indemnitor;

7.7    To file suit to enforce the provisions of this Agreement;

7.8    To apply, as a matter of right and without notice to any Principal or Indemnitor, to any court having jurisdiction to appoint a receiver or receivers of the subject work and/or real property, as applicable, and Principals and Indemnitors hereby irrevocably consent to such appointment and waive notice of any application therefore,

7.9    To enter an appearance on behalf of any/all Indemnitors and to confess judgment in favor of Surety for the full amount sought by Surety as against Indemnitors;

7.10    To exercise any and all rights and remedies of a secured party under the Uniform Commercial Code, including the right to require the Indemnitors to assemble collateral and make it available to Surety at a place reasonably convenient to Surety,

7.11    To instruct any obligee to pay any and/or all job funds directly to the Surety even if with respect to a Bond with respect to which no Principal has been terminated or defaulted;

7.12    To enforce the obligation of an account debtor or other person obligated on collateral, and exercise the rights of any Indemnitor with respect to the obligation of the account debtor or other person obligated on collateral to make payment or otherwise render performance to such Indemnitor, and to notify the account debtors or other person(s) obligated on collateral that payments are to be made directly to Surety  The Indemnitors shall not compromise, discharge, extend time for payment or otherwise grant any indulgence or allowance with respect to any account without the prior written consent of Surety.

7.13    To, upon ten (10) calendar day's prior written notice to the Indemnitors, which the Indemnitors hereby acknowledge to be sufficient, commercially reasonable and proper, sell, lease, or otherwise dispose of any or all of the collateral at any time and from time to time at public or private sale, with or without advertisement thereof, and apply the proceeds of any such sale first to Surety's expenses in preparing the collateral for sale (including reasonable attorney's fees), second to the complete satisfaction of all Obligations and/or liabilities of Principals to any Obligee or claimant and/or the liabilities of the Indemnitors to Surety, including the right to hold reserves; and third, as permitted by the Uniform Commercial Code.  The Indemnitors grant a royalty-free license to Surety and any person or entity to which Surety sells, leases or otherwise disposes of said asset(s), for all patents, service marks, trademarks, tradenames, copyrights, computer programs and other intellectual property and proprietary rights, sufficient to permit Surety to exercise all rights granted to Surety under this Section.

7.14    The Indemnitors waive the benefit of any marshalling doctrine with respect to Surety's exercise of rights hereunder;

7 15     The remedies specified above shall be in addition to any other remedies conferred upon Surety by this Agreement, by law or otherwise. Surety shall have the right to enforce one or more remedies conferred upon Surety, successively or concurrently, and the exercise of any one remedy shall not preclude the exercise of any other, and/or

7 16     Surety is hereby granted a power of attorney to execute any and all documents on behalf of any Principal and/or any Indemnitor in order for Surety to be able to unilaterally proceed with its exercise of any and/or all of the foregoing rights

8 ASSIGNMENT   To secure the obligations of Principal and Indemnitor hereunder and any other indebtedness and liabilities of any Principal and/or any Indemnitor to Surety, all Principals and Indemnitors hereby assign, transfer, pledge and convey to Surety, effective immediately upon execution of this Agreement but only to be acted upon by Surety in the event that there shall be an event of default hereunder, all rights in any Bonded contract and/or performance, including, without limitation, all right, title and interest in and to.

8 1      Any and all contracts or subcontracts let in connection therewith and any contractors' or subcontractors' surety bonds;

8 2      Any and all machinery, plant, equipment, tools and/or materials which shall be upon the site or sites of the work or project(s) in connection with the performance of any contract with respect to which a Bond has been executed by Surety or elsewhere for the purposes of the performance of the contract, including all material ordered therefore;

8 3      Any and all sums due or which may become due upon partial or full performance of the contract with respect to which a Bond has been executed by Surety, and all sums due or to become due on all other contracts, covenants and agreements, whether bonded or unbonded, in which any Principal and/or any Indemnitor has any interest, together with any notes, accounts receivable or chose in action related thereto;

8.4      Those rights and interests in any insurance policies applicable in connection with the performance of any contract with respect to which a Bond has been executed by Surety, and/or

8 5      Any and all undisbursed loan funds, deposits or interest reserve accounts to which any Principal and/or any Indemnitor may be entitled and any and all collateral for any undertakings given by any Principal, any Indemnitor or Guarantor in connection with the performance of any contract with respect to which a Bond has been executed by Surety

9 WAIVERS  All Principals and/or Indemnitors hereby waive and/or agree not to assert.

9 1      Any defense that this Agreement was executed subsequent to the date of any Bond, it being expressly understood and agreed that the Indemnitors hereby admit and covenant that all Bonds were executed by Surety pursuant to the request of the Indemnitors and in reliance on the promise of the Indemnitors to execute and to perform this Agreement;

9 2      Any right to claim that any property, including homesteads, is exempt from levy, execution, sale or other legal process under the laws of any country, state, territory or possession in any action brought by Surety under this Agreement;

9 3      Any right to require Surety to proceed against any Principal, Indemnitor and/or any other person, firm or entity, or to proceed against or exhaust any security held by Surety at any time, or to pursue any other remedy in Surety's power Without in any way limiting the generality of the foregoing, if property of any Indemnitor is hypothecated with property of any Principal or of any other party, Indemnitors hereby waive any right to have the property of any Principal or of such other party first applied towards the discharge of the obligations hereunder;

9 4      The defense of the Statute of Limitations in any action hereunder or for the collection of any claim or the performance of any obligation indemnified hereby,

9 5      Any defense based upon an election of remedies by Surety, irrespective of whether any Principal or Indemnitor alleges that Surety's decision otherwise impairs the subrogation rights of any Principal or Indemnitor or the right of any Indemnitor to proceed against any Principal or to realize upon any security (whether such destruction or impairment of subrogation results from the operation of anti-deficiency statutes or otherwise);

9 6      Any defense based upon any legal disability or other defense of any Principal, any other Indemnitor or other person, or by reason of the cessation or limitation of the liability of any Principal from any cause other than full payment of all sums payable under this Agreement;

9 7      Any defense based upon any lack of authority of the officers, directors, partners or agents acting or purporting to act on behalf of any Principal, Indemnitor and/or any principal of any Principal and/or any Indemnitor, or any defect in the formation of any Principal, Indemnitor and/or any principal of any Principal and/or any Indemnitors;

9.8      Any defense based upon Surety's failure to disclose to any Indemnitor any information concerning any Principal's financial condition or any other circumstances bearing on any Principal's or Indemnitor's ability to pay any sums payable under this Agreement;

9.9      Any defense based upon any statute or rule of law which provides that the obligations of a surety must be neither larger in amount nor in any other respects more burdensome than that of a principal;

9 10     Any defense based upon Surety's election, in any proceeding instituted under the Federal Bankruptcy Code, of the application of Section 1111 (b)(2) of the Federal Bankruptcy Code or any successor statute,

9 11     Any right of subrogation and/or any right to enforce any remedy which Surety may have against any Principal and/or Indemnitor and/or any right to participate in, or benefit from, any security for the obligations hereunder held by Surety;

Initials

9.12    Any defense based upon the Entire Controversy Doctrine or mandatory joinder rule; and/or

9.13    THE RIGHT TO A JURY TRIAL.

10.  AUTHORIZATION TO SURETY.  All Principals and/or Indemnitors hereby authorize and expressly empower Surety, in the sole and absolute discretion of Surety, to do the following:

10.1    From time to time to make or to consent to any change in or to issue any substitute for or renewal of, any Bond or any Obligation referred to in any Bond, and this Agreement shall apply to such substitute or changed Bond, Obligation or renewals thereof. Any such changes, substitutions or renewals may be made without giving notice to Indemnitors or obtaining Indemnitors' consent and without affecting the liability of any Indemnitor hereunder;

10.2    If any Bond is given in any action or proceeding in any court, to recognize any attorney of record in such action or proceeding for any party thereto at the date of execution of the Bond as the authorized representative of such party until Surety shall have been fully discharged from liability under the Bond;

10.3    To take such steps as Surety may deem necessary or proper to obtain release from liability under any Bond; and/or

10.4    To enter any Principal's and/or any Indemnitor's place of business or the place of performance of any Bonded obligation during customary business hours or, in case of emergency, at any time for the purpose of inspecting, reviewing and/or making copies of the books, records, accounts, job records, contracts and/or other documents deemed by Surety, in its sole discretion, to relate to performance of any Obligation or to performance of any duty of Principal or Indemnitor hereunder.

10.5    To execute a mortgage or mortgages, in the names of the property owners, on any/all real estate owned    by them and to record same.

11.  LIABILITY UNAFFECTED.  The liability of Indemnitors hereunder shall not be affected by the failure of any party to sign any Bond nor by any claims that other indemnity or security was to have been obtained nor by the release of any indemnity or Indemnitor, nor by the release, substitution or subordination of any collateral that may have been obtained. If any party signing this Agreement is not bound for any reason, all other signatories hereto shall be bound for the full amount of liability hereunder.

12.  POWER OF ATTORNEY.  All Principals and/or Indemnitors each hereby irrevocably nominate, constitute, appoint and designate Surety, or the designee of Surety, as their attorney-in-fact with the right and power, but not the obligation, to exercise all of the rights assigned, transferred and set over to Surety by any Principal or Indemnitor under this Agreement, and to make, execute and deliver in the name of any Principal and/or any Indemnitor any and all additional contracts, instruments, assignments, mortgages, releases, checks, drafts, notes, certificate of deposits, letters of credits, deeds, bills of sale, authorizations, documents or papers (including, but not limited to, those related to the disbursement of loan proceeds, the commencement of proceedings and/or the execution of instruments referred to above; the endorsement of checks or other instruments payable to any Principal or any Indemnitor representing payment of Obligation monies and/or execution of any insurance claims, requisitions and/or warranties) deemed necessary and/or proper by Surety in order to give full effect to the intent and meaning of the assignments or rights contained herein and/or the full protection intended to be given to Surety under all other provisions of this Agreement. In furtherance of the granting of this Power of Attorney, the Principal and/or Indemnitors will execute the Power of Attorney in the form attached hereto, which the Surety may record when, and if, it deems necessary to further effectuate the rights and powers granted herein.    It is expressly understood and agreed that the foregoing power of attorney is coupled with the interest of Surety in receiving the indemnification/exoneration of/from Indemnitors hereunder. Indemnitors hereby ratify and affirm all acts and actions which shall be taken and done by Surety or its designee as such attorney-in-fact.  The Indemnitors hereby waive, release, and forever discharge Surety and its past, present, future officers, directors, partners, subsidiaries, affiliates, successors and assigns, if any, of and from all other liabilities of any kind or description whatsoever, either in law or in equity, whether known or unknown, suspected or unsuspected, direct or indirect, which the Indemnitors had, now have, or hereinafter may have against the Surety as a result of having taken any action or done any such thing as such attorney in fact or otherwise under this Agreement.

13.  TERMINATION OF INDEMNITOR LIABILITY.  Except with respect to any Bond(s) which is/are specifically within the scope of another indemnity agreement, this Agreement is a continuing obligation of Indemnitors unless terminated as to future Bonds by written notice to Surety as hereinafter provided; and such termination by any Indemnitor shall in no way affect the obligation or liability of any other Indemnitor who has not given such notice, which shall continue until Surety is exonerated from liability under all Bonds and Surety has recovered all amounts owing from Indemnitors hereunder. The liability of Indemnitors hereunder as to future Bonds shall not terminate by reason of the failure of the Surety to disclose facts known about any Principal, even though such facts materially increase the risk beyond that which any Indemnitor might intend to assume. The Indemnitors hereby waive notice of any such facts, whether or not the Surety may have reason to believe that such facts are unknown to the Indemnitor or whether the Surety may have had a reasonable opportunity to communicate such facts to the Indemnitor In order to terminate liability as to any future Bond, an Indemnitor must:

13.1    Give to Surety written notice of such termination by certified mail, return receipt requested, addressed to Surety at the Surety's Address;

13.2    State in such notice the effective date, which date shall be not less than 30 days following receipt of such notice by the Surety, of the termination of the liability of such Indemnitor for any future Bond; and

13.3    Following the effective date of such termination, such Indemnitor shall continue to be liable hereunder for (i) any Bond executed or authorized and/or any Obligation entered into prior to such effective date of termination, and all renewals, substitutions, extensions and/or modifications thereof, (ii) any Bond executed pursuant to a bid, proposal Bond or surety consent executed or authorized prior to such effective date of termination, and any renewals, substitutions, extensions and modifications thereof, and (iii) any maintenance or guarantee Bond executed incidental to any other Bond executed prior to such date of termination, and any renewals, substitutions and extensions thereof.

Initials

14 GENERAL PROVISIONS.

14.1    The obligations of the Indemnitors hereunder are joint and several. Surety may bring separate suits hereunder against any or all of the undersigned as causes of action may accrue hereunder Indemnitors hereby expressly waive the benefit of any statute or rule of law which gives any Indemnitor the right to require Surety to first proceed against Principal or other Indemnitors or which exonerates any Indemnitor from any liability if Surety fails to first proceed against any Principal or any Indemnitor

14.2    All Principals and/or Indemnitors shall, upon request of Surety, procure the discharge and exoneration of Surety under any Bond and from and against any and all liability by reason thereof

14.3    All Indemnitors hereby warrant and represent that each Indemnitor is specifically and beneficially interested in obtaining each Bond. Additionally, Indemnitors acknowledge that Indemnitors' undertakings given hereunder are given in consideration of the execution or issuance of any Bond coming within the scope of this Agreement, and that Surety would not execute or issue any such Bond were it not for the execution and delivery of this Agreement by Indemnitors.

14.4    Indemnitors hereby waive notice of any default, the making of a claim against Surety or the loaning of funds to any Principal by Surety

14.5    Principals and/or Indemnitors hereby agree to give Surety prompt notice of any facts which might give rise to any claims or suits against Surety upon any Bond and to cooperate fully with surety in the investigation of and defense concerning any such claims or suits.

14.6    Surety shall have the right, in its full and absolute discretion, to decline the execution of any Bond, including a final Bond when it has furnished a Bid Bond and/or consent to issuance of a Bond  Indemnitors waive any and all rights against Surety, if any, pertaining thereto

14.7    Surety may consent to any changes or alterations in any Obligation, without affecting the liability hereunder of any Indemnitor

14.8    Surety shall have every right, defense or remedy which a personal surety without compensation would have, including the right of exoneration.

14.9    Until Surety shall have been furnished with conclusive evidence of the discharge and exoneration of Surety without loss from all Bonds, and until Surety shall have been otherwise fully indemnified as hereunder provided, Surety shall have the right of free access to the books, records, credit reports and accounts of all Principals and/or Indemnitors for the purpose of examining and copying them. Principals and Indemnitors each hereby authorize third parties, including but not limited to, depositories of funds of any Principal and any Indemnitor, to furnish to Surety any information requested by Surety in connection with any transaction. Surety may furnish any information which it now or hereafter may acquire concerning the Principal and/or Indemnitor to any other persons, firms or entities for the purpose of procuring co-suretyship or reinsurance or of advising such persons, firms or entities as Surety may deem appropriate.

14.10   The term "Surety" as used herein shall mean any surety company or companies issuing Bond(s) in favor of any Principal or Indemnitor, including but not limited to bonds issued by or through the efforts of Dale Group, Inc., any representative thereof, and/or any representative and/or agent thereof  If the Surety procures any reinsurance for any Bond(s), then the terms and conditions of this Agreement shall apply to and operate for the benefit of such other company or companies, its successors and assigns so as to give them a direct right of action against the Indemnitors to enforce this Agreement, regardless of whether the Surety itself executes or retains any portion of the obligations of such Bonds. Indemnitors understand that no one has the right to pursue Surety's reinsurers directly, other than Surety or its representative

14.11   If the execution of this Agreement by any Indemnitor is found to be defective or invalid for any reason, such defect or invalidity shall not affect the validity of this Agreement with respect to any other party  The invalidity of any provision of this Agreement by reason of the laws of any state or by any reason shall not affect the validity of any other provision of this Agreement.

14.12   Indemnitors hereby grant to Surety a security interest in the properties, assets and rights of Indemnitors as described in Paragraph 8 hereof, wherever the same shall be located, and whether now owned or hereafter acquired, and all products and proceeds thereof (the "Collateral). This Agreement shall for all purposes constitute a security agreement for the benefit of the Surety in accordance with the Uniform Commercial Code and all similar statutes. Surety may, at its option and discretion, file or record this Agreement, financing statements, continuation statements and amendments and/or any other document executed by any Principal or Indemnitor individually or jointly, in connection with the application, issuance or execution of any Bond coming within the scope of this Agreement, including, without limitation, any notice of the prior interest in assignment of the same under the provisions of the Uniform Commercial Code or any other statute, ordinance or regulation of any jurisdiction or agency and describe the Collateral in particular or as all assets of any Indemnitor, or words of similar effect and which contain any other information required by the Uniform Commercial Code for the sufficiency or filing office acceptance. The filing or recording of any such document shall be solely at the option of Surety  The failure of such filing shall not release or discharge any of the obligations of any Indemnitor under this Agreement. Indemnitors shall execute and deliver such additional documents as Surety may deem necessary or desirable to accomplish any such filing or recording.  It is expressly agreed that the provisions of Section 12 hereof apply to this Subsection.

14.13   This Agreement may not be changed or modified orally, but only by an instrument in writing, signed by all Indemnitors and consented to by Surety, in writing.

14.14   Surety may maintain repeated actions to enforce the terms of this Agreement as causes of action accrue or as breaches of the same occur without any former action operating as a bar to any subsequent action

Initials _MH_

Rev 126/2016

14 15    Wherever used in this Agreement, the plural shall include the singular, the singular shall include the plural and the neuter shall include both genders as the circumstances require.

14 16    It is understood and affirmed that Bonds are a credit relationship, and Principals and/or Indemnitors authorize and empower Surety, or any of Surety's authorized agents, to gather such credit information as Surety considers necessary and appropriate for purposes of evaluating whether such credit should be granted or continued. Indemnitors waive their rights in connection therewith.

14 17    Indemnitors have established adequate means of obtaining from sources other than Surety, on a continuing basis, financial and other information pertaining to Principal's financial condition and the status of the Principal's performance of the Obligations with respect to each Bond covered hereby, and Indemnitors agree to keep adequately informed from such means of any facts, events or circumstances which might in any way affect any Indemnitor's risks hereunder and Surety has made no representations with respect to such matters.

14 18    By exercising or failing to exercise any of its rights, options or elections hereunder, Surety shall not be deemed to have waived any breach or default on the part of any Indemnitor or to have released any Indemnitor from any of their obligations hereunder, unless such waiver or release is in writing and is signed by an authorized representative of Surety. In addition, the waiver by Surety of any breach or default hereunder shall not be deemed to constitute a waiver of any succeeding or preexisting breach or default.

14 19    The obligations of Principals and/or Indemnitors hereunder shall be in addition to and shall not limit or in any way affect the obligations of Principal and/or Indemnitor under any other existing or future indemnities or guarantees unless said other indemnities or guarantees are expressly modified or revoked in writing.  In the event any other indemnification agreement is executed in favor of Surety by any Indemnitor, Surety shall reserves any and all rights hereunder  Such subsequent execution shall not operate as an accord and satisfaction or otherwise change or alter the obligations of any Indemnitor hereunder

14.20    This Agreement may be executed in any number of counterparts, each of which shall be deemed an original hereof and all of which, taken together, shall constitute but one and the same instrument.

14.21    Any indebtedness of any Indemnitor now or hereafter held by any other Indemnitor is hereby subordinated to the indebtedness of Indemnitors to Surety, and such indebtedness of any Indemnitor to any other Indemnitor shall, if Surety so requests, be collected, enforced and received by the Indemnitor as trustee for Surety and be paid over to Surety on account of the indebtedness of any Indemnitor to Surety, but without reducing or limiting in any manner the liability of Indemnitors under the provisions of this agreement

14.22    ALL  INDEMNITORS EXPRESSLY WARRANT AND REPRESENT THAT THEY HAVE CAREFULLY REVIEWED THIS AGREEMENT, THAT THEY UNDERSTAND EACH AND EVERY TERM AND CONDITION AND KNOWINGLY AGREE TO BE BOUND HEREBY, AND, IF APPLICABLE, THAT THEY ARE THE PERSON WITH AUTHORITY TO SIGN ON BEHALF OF  COMPANY

IN WITNESS WHEREOF, each Indemnitor, intending to be legally bound hereby, have executed this Agreement effective as of this _2ᵗʰ_ day of _August_, 2017

## INDEMNITORS - PARTNERSHIP AND CORPORATIONS
## INCLUDING LIMITED LIABILITY COMPANIES

Principal: Trio Siteworks, LLC

By: _____

Name & Title: Paul Verna, Managing Member

Taxpayer ID# ▆▆▆▆▆▆▆

Address: 1167 W  Baltimore Pike

Suite 268, Media, Pa  19063


Principal: _____

By: _____

Name & Title: _____

Taxpayer ID#: _____

Address: _____

_____


Principal: _____

By: _____

Name & Title: _____

Taxpayer ID# _____

Address: _____

_____


Principal: _____

By: _____

Name & Title: _____

Taxpayer ID# _____

Address: _____

_____

**INDIVIDUAL INDEMNITORS**

By: _____

Name: Paul Verna _____

Social Security #: ~~████~~

Home Address: _____

600 Crum Creek Rd.,

Media PA  19063

By: _____

Name: Maria Verna _____

Social Security #: ~~████~~

Home Address: _____

600 Crum Creek Rd.,

Media PA  19063

By: _____

Name: _____

Social Security #: _____

Home Address: _____

_____

_____

By: _____

Name: _____

Social Security #: _____

Home Address: _____

_____

_____

By: _____

Name: _____

Social Security #: _____

Home Address: _____

_____

_____

By: _____

Name: _____

Social Security #: _____

Home Address: _____

_____

_____

By: _____

Name: _____

Social Security #: _____

Home Address: _____

_____

_____

By: _____

Name: _____

Social Security #: _____

Home Address: _____

_____

_____

## ACKNOWLEDGEMENT OF PRINCIPAL, IF A CORPORATION

STATE OF _____ ) ss:
COUNTY _____ )

On the _____ day of _____ in the year 20_____ ,
Before me personally came_____ _____ to me known, who, being
by me duly sworn, did depose and say that (s) he resides at
_____, that (s) he is the
_____ of
_____, the corporation described in and
which executed the above instrument; and that (s) he signed her/his name thereto by order of the
Board of Directors of said corporation.

My commission expires. _____ _____
                                                                    Notary Public

## ACKNOWLEDGEMENT OF PRINCIPAL, IF A PARTNERSHIP

> COMMONWEALTH OF PENNSYLVANIA
> NOTARIAL SEAL
> Dawn Kleinman, Notary Public
> Media Boro, Delaware County
> My Commission Expires Oct. 30, 2018
> MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

STATE OF PA_____ ) ss:
COUNTY OF Delaware_____ )

On the 2nd _____ day of August _____ in the year 20 17 ,
Before me personally came Paul Verna_____ to me known and known to
me to be a member of the firm Trio Siteworks, LLC.
described in and who executed the foregoing instrument; and (s) he duly acknowledged to me
that (s) he executed the same for and in behalf of said firm for the uses and purpose mentioned
therein.

My commission expires: _10|30|2018_     _Dawn Kleinman_
                                                                    Notary Public

## ACKNOWLEDGEMENT OF PRINCIPAL, IF AN INDIVIDUAL

> COMMONWEALTH OF PENNSYLVANIA
> NOTARIAL SEAL
> Dawn Kleinman, Notary Public
> Media Boro, Delaware County
> My Commission Expires Oct. 30, 2018
> MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

STATE OF PA_____ ) ss:
COUNTY OF Delaware_____ )

On the 2nd _____ day of August _____ in the year 20 17 ,
Before me personally came Paul Verna and Maria Verna_____ to me known and
known to me to be the person described in and who executed the foregoing instrument and (s) he
duly acknowledged that (s) he executed the same.

My commission expires: 10|30|2018_     _Dawn Kleinman_
                                                                    Notary Public

Q8

Prepared by:

## IRREVOCABLE POWER OF ATTORNEY

This Power of Attorney is made on this 2<u>nd</u> day of <u>August</u>, 20 17.

**Between the PRINCIPAL**

<u>Trio Siteworks, LLC.</u>, whose address is <u>1167 W. Baltimore Pike, Suite 268 Media PA 19063</u>, and,

<u>[All Individuals] Paula Verna and Maria Verna</u> individually and jointly referred to as "I" or "my",

**And the SURETY,**
**Accredited Surety and Casualty Company, Inc., Bondex Insurance Company, Boston Indemnity Company, Inc.,** and any reinsurer, surety or co-surety on any Bond and/or any other person or entity who executes any Bond at its request and/or any other person or entity which the Surety may procure to act as program manager for the Surety, including but not limited to **Bondex Program Managers** and **East Coast Surety Agency, LLC,** as well as any successor(s) and/or assign(s) of any of the foregoing, referred to as "**You**".

**Grant of Authority.** I appoint Marney Emel, CFO of Accredited, Philip S. Tobey, Lionel D. Jorge and Matthew J. Semeraro as authorized signers on behalf of the Surety to act as my Agent (called an attorney in fact) to do each and every act which I could personally do for the following uses and purposes:

        a.      To exercise all of the rights assigned, transferred and set over to you, and to make, execute and deliver in my name any and all additional contracts, instruments, assignments, mortgages, releases, checks, drafts, notes, certificates of deposit, letters of credit, deeds, bills of sale, authorizations, documents or papers (including, but not limited to, those related to the disbursement of loan proceeds, the commencement of proceedings and/or the execution of instruments referred to above; the endorsement of checks or other instruments payable to any Principal representing payment of Obligation monies and/or execution of any insurance claims, requisitions and/or warranties) deemed necessary and/or proper by You in order to give full effect to the intent and meaning of the assignments or rights contained in a certain General Agreement of Indemnity I am simultaneously executing and/or have executed, and/or the full protection intended to be given to You under all other provisions of the General Agreement of Indemnity. Consistent therewith, since the General Agreement of Indemnity provides for Me to indemnify and/or exonerate You, I expressly agree to You executing in my name a Consent Judgment and/or, in all jurisdictions which recognize entry of a Confession of Judgment, a Confession of Judgment. The amount of the Consent Judgment and/or Confession of Judgment may equal the total of all claims under all Bonds (for these purposes, the amount of a claim under a performance bond shall equal the amount of the paid and/or projected cost to complete and/or the amount of any paid and/or anticipated settlement or payment) plus all incurred/paid and/or projected expenses, including but not limited to attorneys fees and consulting fees. The amount of said Consent Judgment and/or Confession of Judgment may be supplemented, either by amendment of the Consent Judgment/Confession of Judgment or by execution of a supplemental Consent Judgment/Confession of Judgment, each time that a further claim is received, a further payment is made and/or a further payment or expense is projected or incurred/paid.

        b.      To perform any other act on my behalf which You may consider necessary and/or helpful to enforce the terms and conditions and powers granted in the General Agreement of Indemnity which if fully incorporated herein by reference.

**Powers.** I give You all the power and authority which I may legally give to You. This Power of Attorney is coupled with an interest and I recognize that only You may revoke this Power of Attorney or appoint a new Agent in your place. I approve and confirm all that You and/or your substitute may lawfully do on my behalf and I release You and/or your substitute from any act(s) which You and/or your substitute take consistent herewith. This Power of Attorney is effective and remains in effect even if I become disabled.

**Signatures.** By signing below, I acknowledge that I have received a copy of this Power of Attorney and that I understand its terms.

### [SIGNATURE PAGES TO FOLLOW]

1

Rev July 2016

## CORPORATE SIGNATURE FOR IRREVOCABLE POWER OF ATTORNEY

Witnessed By:

Stan Miller

[PRINCIPAL]
Trio Siteworks, LLC.

By: _____

Name:  Paul Verna
Title:  Managing Member

### ACKNOWLEDGEMENT OF PRINCIPAL, IF A CORPORATION

STATE OF _____ )
COUNTY _____ ) ss:

On the _____ day of _____ in the year 20_____,
Before me personally came_____ _____ to me known, who, being by me duly sworn, did depose and say
that    (s)   he    resides    at    _____ ____ _____ ,    that    (s)   he   is   the
_____ of _____ the
corporation described in and which executed the above instrument, and that  (s) he signed her/his name thereto by order of the Board
of Directors of said corporation.

My commission expires: _____ ___ _____ _  _____
                                                          Notary Public

### ACKNOWLEDGEMENT OF PRINCIPAL, IF A PARTNERSHIP

STATE OF  PA _____ )
COUNTY OF  Delaware _____ ) ss:

On the  2nd  day of  August  in the year 20  17 ,
Before me personally came  Paul Verna  to me known and known to me to be a member of the firm
Trio Siteworks, LLC.  , described in and who executed the foregoing instrument; and (s) he
duly acknowledged to me that (s) he executed the same for and in behalf of said firm for the uses and purpose mentioned therein.

My commission expires:  10/30/2018  _____
                                                          Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Dawn Kleinman, Notary Public
Media Boro, Delaware County
My Commission Expires Oct. 30, 2018
PENNSYLVANIA ASSOCIATION OF NOTARIES

### ACKNOWLEDGEMENT OF PRINCIPAL, IF AN INDIVIDUAL

STATE OF ___ _____ )
COUNTY OF _____ _____ ) ss:

On the _____ day of _____ _____ in the year 20 _____,
Before me personally came _____ _____ to me known and known to me to be the person described
in and who executed the foregoing instrument and (s) he duly acknowledged that (s) he executed the same.

My commission expires: _____ ___ _____  _____
                                                          Notary Public

RECORD AND RETURN TO:
Underwriter:
Address:

2

## INDIVIDUAL'S SIGNATURE FOR IRREVOCABLE POWER OF ATTORNEY

Witnessed By:

By: _____
Name: Paul Verna
Title: Individually

Stan Miller

## ACKNOWLEDGEMENT OF INDIVIDUAL

STATE OF PA _____ ) ss:
COUNTY OF Delaware _____ )

On the 2nd ____ day of August ____ in the year 20 17 ,
Before me personally came Paul Verna _____ to me known and known to me to be the person described
in and who executed the foregoing instrument and (s) he duly acknowledged that (s) he executed the same.

My commission expires: 10/30/2018 _____   ___Dawn Kleinman__
Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Dawn Kleinman, Notary Public
Media Boro, Delaware County
My Commission Expires Oct. 30, 2018
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

RECORD AND RETURN TO:
Underwriter:
Address.

3

Rev July 2016

### INDIVIDUAL'S SIGNATURE FOR IRREVOCABLE POWER OF ATTORNEY

Witnessed By:

Stan Miller

By: _____
Name: Maria Verna
Title:   Individually

### ACKNOWLEDGEMENT OF INDIVIDUAL

STATE OF _PA_ ) ss:
COUNTY OF _Delaware_ )

On the _2nd_ day of _August_ in the year 20 _17_,
Before me personally came _Maria Verna_ to me known and known to me to be the person described
in and who executed the foregoing instrument and (s) he duly acknowledged that (s) he executed the same.

My commission expires: _10/30/2018_

_____
Notary Public

```
COMMONWEALTH OF PENNSYLVANIA
         NOTARIAL SEAL
    Dawn Kleinman, Notary Public
   Media Boro, Delaware County
  My Commission Expires Oct. 30, 2018
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES
```

RECORD AND RETURN TO:
Underwriter
Address:

Rev July 2016

4